OPINION OF THE COURT
Zelda Jonas, J.
Motion by defendant, David Zuckerman, and cross motion by *497 defendants, Doris Korona and Winthrop University Hospital, for summary judgment dismissing the complaint are denied.
Plaintiff, John Quirk, injured his right arm on June 8, 2000. He alleges that he accidentally crushed his right forearm in the folding extensions of a falling A-frame ladder (Quirk transcript at 74). He went to South Nassau Communities Hospital that night but left after several hours without receiving treatment (Quirk transcript at 96). The next morning plaintiff sought treatment at the emergency room of defendant, Winthrop University Hospital (Winthrop). The triage nurse, nurse Lina, noted inter alia that plaintiff complained of pain in the right elbow and wrote “area swollen” in the triage record (adult triage assessment sheet, exhibit F to defendant Zuckerman’s moving papers). She assigned plaintiff to the fast-track area of the emergency room (Lina transcript at 28, 34). Thereafter, plaintiff was examined by defendant, Doris Korona, a nurse practitioner. Korona ordered an X ray of plaintiff’s right elbow, which was normal. She placed plaintiff’s arm in a sling, advised plaintiff to ice the elbow and to elevate the arm, prescribed Vicoprofen, a narcotic drug, to plaintiff, and told plaintiff to follow up with an orthopedist. The diagnosis set forth in the emergency room record was epicondylitis or “tennis elbow” (emergency department record, exhibit K to plaintiffs’ opposition papers). Defendant Zuckerman, Winthrop’s attending physician in the emergency room, after consultation with nurse practitioner Korona, signed plaintiff’s emergency room record and the prescription for the Vicoprofen. Zuckerman never examined or spoke to plaintiff, John Quirk.
The next morning, on June 10, 2000, when plaintiff awoke, his right arm was completely swollen, and the pain was excruciating (Quirk transcript at 138-139). He returned to the emergency room at Winthrop, where he was now diagnosed with “Compartment Syndrome” (exhibit J to defendant Zuckerman’s moving papers). Compartment Syndrome, as explained by plaintiffs’ expert, is an increased tissue pressure within an intracompartmental structure, here the muscle compartments in the forearm, which results in decreased capillary blood flow in the collateral vessels ending in local tissue infection and necrosis caused by oxygen deprivation. (See, plaintiffs’ expert’s affidavit, exhibit I to plaintiffs’ opposition papers.) A fasciotomy was performed in the operating room. On June 11, 2000, plaintiff underwent above-elbow amputation. (See operating room records, exhibit H to plaintiffs’ opposition papers.)
*498 The court must first address Dr. Zuckerman’s claim that his involvement with plaintiffs case was limited to approval of nurse practitioner Korona’s diagnosis and treatment and that he had no duty to examine plaintiff in Winthrop’s emergency room. Such a claim appears to reject the existence of a physician-patient relationship, without which there can be no liability for medical malpractice. (See, White v Southside Hosp., 281 AD2d 474 [2001].)
However, plaintiffs malpractice cause of action against defendant, Dr. Zuckerman, is derived from his consultation with the codefendant, the nurse practitioner Korona, in the diagnosis and treatment of the plaintiff. Therefore, it is important that the court examine the relationship between the attending physician and the nurse practitioner. The practice of a registered nurse practitioner as defined in Education Law § 6902 (3) (a) includes diagnosis of illness and physical conditions and the performance of therapeutic and corrective measures in “collaboration” with a licensed physician qualified to collaborate in the specialty involved. While the word “collaborate” is not legally defined by statute, the court can certainly apply its common ordinary meaning as defined in Webster’s Dictionary, which is as follows: “cooperate, join (forces), work together, team up.” The nature of the relationship which constitutes collaboration is rather left to the proviso that all services be performed in accordance with a written practice agreement and written practice protocols which shall contain explicit provisions for the resolution of disputes between the nurse practitioner and the collaborating physician (8 NYCRR 64.5). However, the statute is clear that if the written agreement does not so provide, then the collaborating physician’s diagnosis or treatment shall prevail if there be any conflict in diagnosis (Education Law § 6902 [3] [a]). Therefore, the ultimate responsibility for diagnosis and treatment rests with the physician if the written agreement is silent.
Under the circumstances presented herein, there was a relationship of cooperation and teamwork between Dr. Zuckerman and the nurse practitioner, Korona. Even though the defendant, Dr. Zuckerman, did not perform a physical exam upon plaintiff, Dr. Zuckerman collaborated with the nurse practitioner who performed the full physical examination on plaintiff. The deposition of the nurse practitioner, Korona, indicates that she arrived at her diagnosis of epicondylitis “After I collaborated with my attending,” referring to defendant, Dr. Zuckerman (defendant’s exhibit H, at 55, lines 7, 12-15). More specifically, *499 the nurse practitioner testified that she presented the patient’s case to Dr. Zuckerman for discussion after she had conducted a full examination of the patient (defendant’s exhibit H, at 58, line 13). It is not in dispute that there was a diagnosis of plaintiff rendered after the discussion between Dr. Zuckerman and nurse practitioner Korona. Since there was no written protocol by the hospital, the ultimate responsibility for the diagnosis and treatment rests with Dr. Zuckerman if there was a conflict in diagnosis. {See, Education Law § 6902 [3] [a].)
Whether or not the collaboration between Dr. Zuckerman and nurse practitioner Korona constitutes an implied physician-patient relationship between Dr. Zuckerman and the plaintiff is a question of fact for the jury to decide. A physician-patient relationship is created when the professional services of a physician are rendered to and accepted by another for the purposes of medical or surgical treatment (Zimmerly v Good Samaritan Hosp., 261 AD2d 614 [1999]). Generally the existence of a physician-patient relationship is a factual issue for the jury (Wienk-Evans v North Shore Univ. Hosp. at Glen Cove, 269 AD2d 443 [2000]; Bienz v Central Suffolk Hosp., 163 AD2d 269 [1990]). An implied physician-patient relationship can arise when a physician gives advice to a patient, even if the advice is communicated through another health care professional (Raptis-Smith v St. Joseph’s Med. Ctr., 302 AD2d 246 [2003]; see generally, Lee v City of New York, 162 AD2d 34 [1990]; Cogswell v Chapman, 249 AD2d 865 [1998]; Campbell v Haber, 274 AD2d 946 [2000]).
Under all of the circumstances of this case, including Dr. Zuckerman’s prescription of narcotic medication for plaintiff and his collaboration and approval of the diagnosis and treatment by the nurse practitioner of the injured plaintiff, this court is compelled to conclude that plaintiffs have established the existence of a physician-patient relationship between Dr. Zuckerman and plaintiff, John Quirk (cf. Ingber v Handler, 128 AD2d 591 [1987]).
As for the duty imposed by that relationship, “[a] doctor is charged with the duty to exercise due care, as measured against the conduct of his or her own peers — the reasonably prudent doctor standard” (Nestorowich v Ricotta, 97 NY2d 393, 398 [2002]). A decision that is something less than a professional medical determination or not the product of a careful examination and evaluation does not suffice (see generally, Davis v Patel, 287 AD2d 479 [2001]). Especially since swelling is a key symptom of Compartment Syndrome (see, Merritt v Sara- *500 toga Hosp., 298 AD2d 802 [2002]), and the triage nurse noted swelling while the nurse practitioner made no written mention of swelling, plaintiffs argue that it was incumbent on Dr. Zuckerman to examine John Quirk’s arm himself. On this record the parties’ experts provide conflicting testimony as to whether the conduct of Dr. Zuckerman met or breached the duty of due care. Such conflicting evidence presents a credibility issue for the jury to decide (Zygmunt v Berkowitz, 301 AD2d 593 [2003]; Thomas v Brookdale Hosp, Med. Ctr., 287 AD2d 448 [2001]; Halkias v Otolaryngology-Facial Plastic Surgery Assoc., 282 AD2d 650 [2001]).
There are also triable issues of fact presented as to whether defendant Korona exercised the due care that is required of nurse practitioners, and thus whether she committed malpractice (see, Rivera v County of Suffolk, 290 AD2d 430 [2002]). According to Education Law § 6902 (3), a nurse practitioner may diagnose and perform therapeutic and corrective measures in collaboration with a licensed physician in accordance with written protocols. The chairman of the Department of Ambulatory Care at Winthrop admits that no written rules, regulations, policies, or procedures governing nurse practitioners at Winthrop have been located (Brody affidavit, exhibit M to Dr. Zuckerman’s moving papers). Here, the nurse practitioner never made any written mention of any swelling of plaintiff’s arm in the emergency department record in contrast to the triage nurse’s note.
In a medical malpractice case in which causation is almost always a difficult issue, a plaintiff need do no more than offer sufficient evidence from which a reasonable person might conclude that it is more probable than not that the injury was caused by the defendant (Minelli v Good Samaritan Hosp., 213 AD2d 705, 706 [1995]) or that the defendant’s conduct was a substantial factor in causing injury to the plaintiff (Blanar v Dickinson, 296 AD2d 431, 432 [2002]). Delay in proper diagnosis and treatment may be the proximate cause of a plaintiff’s injuries (see, Walker v Zdanowitz, 265 AD2d 404 [1999]), and plaintiffs’ expert has provided evidence that the delay in proper diagnosis and treatment here was a substantial factor in allowing John Quirk’s condition to progress to the stage where he developed irreversible tissue damage necessitating amputation (cf. Merritt). Accordingly, the issue of proximate cause is for the jury to determine.
*501 Based on the foregoing, the motion and cross motion for summary judgment dismissing the complaint must be denied.